**In re Estate of Mary FONOS, Deceased.**

**Appeal of Louise M. PORAC, Matthew Pope, Joseph Pope, Michael James Anthony, Walter Wacht, Jean Bracalento, Louise Nelson, Margaret Mary Pope Epstein, Alan Pope, Marion Sutherland, Richard Wacht, Joseph Porac, Suzanne Scott, Thomas Pope, Katherine Coulter, Geraldine Delong, Clare Porac, Marion Porac, Mark Kalas**

Superior Court of Pennsylvania.

Argued May 22, 1997.

Filed July 1, 1997.

Reargument Denied Sept. 9, 1997.

▮

---

Louise Porac, Homestead, for appellants.

Michael J. Murphy, Munhall, for appellants.

Before McEWEN, President Judge, and KELLY and OLSZEWSKI, JJ.

OLSZEWSKI, Judge.

In June of 1989, Mary Fonos, aged 88, married Michael Fonos, aged 81. Approximately three and one-half years there-after, Mary died intestate and, after being granted Letters of Administration from the Allegheny County Register of Wills, Michael was named administrator of her estate. Just

weeks later, however, on Christmas day, 1993, Michael died as well. In his will, Michael bequeathed his two children from his previous marriage, Raymond and Doloras, equal shares of his estate.

Raymond then petitioned for, and was granted, Letters of Administration for his father's estate and Letters of Administration D.B.N.C.T.A. for the estate of Mary Fonos.[1] One week later, Louise Porac, a niece of Mary Fonos, filed a petition by which she and numerous other blood relatives of Mary Fonos sought to revoke the Letters of Administration D.B.N.C.T.A. In the petition, the relatives challenged the right of Mary's then-surviving spouse, the late Michael Fonos, to inherit from his deceased spouse.

In support of her assertion that Michael was not entitled to inherit from his wife, appellants claimed that Michael had willfully neglected or refused to support his wife from the inception of their marriage and, as a result, had forfeited his inheritance rights. Administrative Judge Kelly then issued a citation to show cause why the Letters should not be revoked. Following two days of testimony, at which numerous friends and relatives of Mary Fonos testified, the Honorable Nathan Schwartz denied appellants' petition for revocation. After being considered by an *en banc* panel of the Allegheny County Orphan's Court, the Honorable Judges Schwartz and Zavarella denied appellants' post-trial motions. This timely appeal follows.

Instantly, appellants propound several claims which allege that the trial court erred and abused its discretion in denying their petition. As all of these claims touch upon the propriety of spousal forfeiture in the present case, however, we will outline our standard of review at the outset.[2]

Our law does not favor forfeitures; statutes permitting such must, therefore, be strictly construed. *See, e.g., In re Estate of Fisher,* 442 Pa. 421, 422–24, 276 A.2d 516, 517–18 (1971); *Commonwealth v. One 1988 Ford Coupe,* 393 Pa.Super. 320, 328–31, 574 A.2d 631, 636 (1990). Thus, the petitioner in a forfeiture action bears the burden of proof and must demonstrate that the heirs taking by will or through statute are legally undeserving. *See, e.g., In re Estate of Teaschenko,* 393 Pa.Super. 355, 359–61, 574 A.2d 649, 651 (1990).

Appellants' primary claim is that, pursuant to the inheritance forfeiture provision embodied in 20 Pa.C.S.A. § 2106, Michael Fonos surrendered his right to inherit from his wife, Mary. Specifically, appellants contend that Michael willfully and intentionally refused to support Mary from the inception of their marriage to Mary's ultimate day of death.

Because our standard of review mandates strict construction of the statute in question, we will reproduce the applicable section herein:

### § 2106.  Forfeiture

(a) **Spouse's share.**—A spouse, who for one year or upwards previous to the death of the other spouse, has willfully neglected or refused to perform the duty to support the other spouse, or for one year or upwards has willfully and maliciously deserted the other spouse, shall have no right or interest under this chapter in the real or personal estate of the other spouse.

20 Pa.C.S.A. § 2106.

After independently reviewing the record in this case, we must agree with the trial court that, "despite all of the evidence of Michael Fonos' shortcomings, it does not rise

---

1. § 3159.  Letters of administration D.B.N. or D.B.N.C.T.A.

When an entire vacancy occurs in the office of personal representative before administration is completed, the register, in the case of intestacy, shall grant letters of administration de bonis non, and in the case of testacy, letters de bonis non cum testamento annexo, to the person or persons entitled thereto.

20 Pa.C.S.A. § 3159.

2. We note our displeasure that, despite the unambiguous dictate of Pa.R.A.P. 3518(a), appellants have failed to include in their brief to this Court a statement of the scope and standard of review applicable to the disposition of their claims. Such an omission does not, however, preclude effective review of their claims, and we will address their merits. Nonetheless, we expect litigants to fully comply with all procedural rules, regardless of whether default will be detrimental to the substance of their appeal.

to the level required by § 2106 for spousal forfeiture" and that "Michael Fonos did not willfully neglect or refuse to perform his duty of support to his spouse." Slip op., 6/7/96 at 2.

Factually, the record discloses that, at the time the elderly couple wed, Mary was already having some trouble completing daily tasks and living independently. For example, Mary's extensive network of family and friends would often visit to help with household chores, cooking and errand running. *See, e.g.,* T.T., 7/5/94 at 27, 32, 51–52. Also, although Mary paid her own bills from her checking account, her sister would often remind her when a particular bill was due.

Conversely, Michael's life prior to the couple's nuptials was spent in relative solitude; estranged from both family and neighbors due to his crotchety, curmudgeon like nature. For instance, Michael's son Raymond testified that he had a very poor relationship with his father and rarely visited his home after his mother passed away because his father was verbally combative and accusatory. Raymond Fonos' deposition at 6. Similarly, Michael's long-time neighbor testified that Michael had a habit of calling the police for minor and sometimes imagined infractions, such as parking in front of his home. Murzyn's deposition at 5–7. Unlike Mary, Michael steadfastly refused help from others and, consequently, his home had been untidy and in a state of disrepair for some time preceding the wedding. Raymond Fonos' deposition at 28.

After Michael and Mary married, the couple moved into Michael's home. Apparently, Mary had attempted to persuade Michael to live in her house because it was newer and in better repair; Michael, however, refused. T.T. 7/5/94 at 34. It is undisputed that, thereafter, the couple's lifestyle and standard of living rapidly deteriorated. *See, e.g., id* at 36, 67–68.

Michael, by all accounts the more assertive of the two, generally refused to allow Mary's friends and relations to help with household chores as they had before. Verbal battles ensued when Samaritans would offer to vacuum or do laundry for the couple. *See, e.g., id* at 37–38, 53–54, 72. As a rule, Michael would vehemently assert that he could take care of himself and Mary and did not need or appreciate outside intervention. Additionally, Michael acquired power of attorney over Mary's checking account and, although her social security funds were deposited directly into her account, she made no withdrawals throughout the marriage. T.T. 10/24/94 at 15.

During this time, Mary never complained that she was being abused or mistreated, and no testimony was elicited that tended to show that Michael was physically abusive or that he maliciously withheld necessities from Mary. The couple attended weekly church services and occasionally socialized outside their home. Mary told one niece that she tried to refrain from upsetting Michael and, therefore, generally acquiesced to his wishes, but she never stated that he forbade her from any particular activities. T.T. 7/5/94 at 61.

As time passed, visitors to the home began to suspect that both Michael and Mary were suffering from mental, as well as physical, incapacities. This, in turn, made Mary's family even more concerned about Michael's unreasonable behavior. *Id.* at 5960.

In December of 1992, Michael called emergency personnel to his home. Upon their arrival, the paramedics found Mary lying on the floor, incapacitated and covered with bruises, urine and feces. Mary was rushed to the hospital where her condition was stabilized, although her mental acuity continued to fluctuate. *Id.* at 12–13. After speaking with hospital personnel, Mary's niece, Louise Porac, made a complaint of suspected physical abuse to the protective services division of New Heritage, an Allegheny County-funded elder care agency. *Id.* at 56. In the subsequent interview between the New Heritage caseworker and Michael, Michael stated that Mary had fallen and that he had attempted unsuccessfully to drag her across the floor or pull her into a standing position. Only when it became evident that outside help was required did Michael notify the paramedics. *Id.* at 13.

Additionally, the caseworker reported that, during her home visit, she found the premis-

es cluttered yet semi-clean and that the couple had adequate food supplies. The caseworker explained to Michael the differences between personal care homes and nursing homes and relayed her recommendation that Mary should live in such a facility after being released from the hospital. Although Michael initially insisted that Mary should return home, he eventually admitted that he was unable to care for Mary any longer. *Id.* at 11–13.

Upon her release from the hospital, Mary became a resident at the Elder Crest nursing home in Munhall, Pennsylvania. During the six months that Mary lived at Elder Crest, Michael visited her every day. *Id.* at 16. Hospital administrators did, however, contact Louise Porac to elicit her help in settling a substantial, unpaid, bill. A meeting was arranged at which hospital administrator Helen Merlo, Louise Porac and Michael Fonos were present. Michael initially balked at paying the bill and, again, stated that he wanted to take Mary home. After some convincing and insisting, however, Michael relented and paid the $15,000 deficiency in full. *Id.* at 19–20.

On November 1, 1993, Mary died at the nursing home; she was ninety-two years old. Seven weeks later, Michael, aged eighty-nine, was found dead in the couple's house. Although, as stated, their home had been unclean and disheveled prior to Mary's accident, it is evident that, during the time Michael lived alone while Mary was at Elder Crest, the situation greatly worsened. In fact, virtually all of the couple's furnishings, clothing and belongings were thrown away due to their unsalvageable condition. Raymond Fonos' deposition at 28.

After reviewing this evidence, all of which was offered by either neutral parties or friends and relations of Mary, we cannot conclude that Michael willfully neglected or refused to perform his duty to support Mary. Undoubtedly, the couple's living conditions were sub-par, and Michael's churlish, discourteous nature offended many of Mary's friends and, no doubt, Mary herself. Certainly, if Michael had accepted the help so frequently offered from others, the couple's standard of living would have vastly improved. Being an irascible, irritable, choleric

old man is not, however, grounds for spousal forfeiture.

Moreover, we agree with the trial court that Michael's ever-quarrelsome demeanor was exacerbated by his increasing loss of mental capacity. Slip op., 3/7/96 at 2. Any neglect of Mary or himself cannot rightfully be termed willful or intentional; instead, the neglect was the disturbing result of a man increasingly incapable of rational behavior. Michael did not willfully neglect or refuse to support Mary; rather, he willfully refused to accept the help from others that would have increased his ability to care for Mary in the manner to which she had been accustomed prior to their marriage. While this is unfortunate, it is not actionable.

Next, appellants ask this Court to impose liability on Michael pursuant to the Older Adults Protective Services Act, 35 P.S. § 10225.101 *et seq.* Specifically, appellants maintain that, as defined by the Act, Michael qualified as a "caretaker" and, because his care was substandard, he must be held responsible.

Pursuant to § 10225.103 of the Act, a "caretaker" is defined as follows:

> **"Caretaker."** An individual or institution that has assumed the responsibility for the provision of care needed to maintain the physical or mental health of an older adult. This responsibility may arise voluntarily, by contract, by receipt of payment for care, as a result of a familial relationship, or by order of a court of competent jurisdiction. It is not the intent of this act to impose responsibility on any individual if such responsibility would not otherwise exist in law.

35 Pa.S.A. § 10225.103.

It is appellants' contention that Michael assumed the role of Mary's sole provider and dominant caregiver and, because "he failed miserably in his self-appointed role," he should forfeit his inheritance rights. Appellants' brief at 18. This analysis, however, is fundamentally flawed and cannot support the proposition which appellants maintain.

As stated, the evidence adduced at trial reflected the opinions of many of Mary's friends and relations that Michael, as well as

Mary, grew increasingly mentally infirm as the couple aged. T.T. 7/5/94 at 59–60. In fact, the trial court specifically found that "Michael Fonos suffered infirmities of his own which caused many of the unfortunate conditions that existed." Slip op., 3/7/96 at 2.

■ Although the Act does not specify, in its definition of "caregiver," that the person assuming the responsibility for the maintenance of an older individual be mentally stable and alert, we find that such a requirement is necessarily implicit. It would be fundamentally unfair to impose liability on an aged, physically and mentally infirm man who could not adequately care for himself, let alone his spouse.

Further support for this finding can be found in the Act's definition of "neglect," which reads as follows:

"**Neglect.**" The failure to provide for oneself or the failure of a caretaker to provide goods or services essential to avoid a clear and serious threat to physical or mental health. **No older adult who does not consent to the provision of protective services shall be found to be neglected solely due to environmental factors which are beyond the control of the older adult or caretaker,** such as inadequate housing, furnishings, income, clothing or medical care.

35 Pa.S.A. § 10225.103 (emphasis added). Surely, the loss of one's mental faculties must be termed an environmental factor which is beyond the control of the caregiver. As such, Michael cannot be held to the caregiver standards set forth in the Act and any actions on his part that may have been in contravention of the statute are not actionable.

■ Finally, appellants aver that, because the trial court's holding was contingent upon its finding that Michael did not act willfully, the court should have permitted expert testimony relative to the "abusive relationship" that existed between Michael and Mary. We find, however, that the question of whether such testimony should have been admitted at trial is not properly before this Court.

■ Although, in a supplemental post-trial motion, appellants claimed that "the Court erred in not allowing a domestic abuse expert" to testify, our independent review of both the record and the trial transcripts reveals no request or motion to the court that such testimony be allowed.[3] It is axiomatic that the preservation of issues for appellate review entails both presentation during the trial stage and through post-trial motions. Therefore, appellants have waived this issue. *See, e.g.,* Pa.R.A.P. 302; Pa.R.A.P. 2117(c); *Watson v. City of Philadelphia,* 162 Pa. Comm. 340, 344–46, 638 A.2d 489, 491 (1994)("In order to preserve an objection to the exclusion of testimony, the party seeking to have the testimony admitted must make an offer [to the trial court] as to what the testimony is going to establish.").

■ Assuming, however, that this issue was properly presented and preserved, we find that appellants would nonetheless be due no relief, for the present assertions are belied by the record and, thus, are without merit. In support of their contention that "Mary certainly suffered physical harm at the hands of her husband," appellants rely upon the events surrounding Mary's fall and subsequent hospitalization. From the fact that Mary was bruised and in deplorable condition upon arriving at the emergency room, appellants deduce that the injuries must have been the result of intentional abuse. Expert medical testimony, as well as the testimony of Mary's relatives, however, supports Michael's assertion that the wounds were accidental, rather than intentional.

Dr. Michael C. Staschak, appellants' own expert on emergency treatment, stated that the cause of Mary's injuries was twofold; the initial fall and the dragging or pulling afterward.[4] For example, in Dr. Staschak's opinion,

---

3. Our painstaking, independent, review was necessitated by appellants' failure to cite, in their brief, to the places in the record which memorialize their presentation and preservation of this issue.

4. Dr. Staschak was deposed prior to trial and his testimony is included in the official record. He did not, however, testify at trial.

the ecchymotic lesions on the back of the right elbow, the abrasion, was not created by a fall. It was more along the lines of an abrasion or dragging-type injury. The lesions of the upper left arm would be more consistent with someone trying to grab her, to grab an arm as opposed to falling.

Staschak's deposition, 10/25/94 at 32–33. Additionally, Mary's granddaughter stated that, when she asked her grandmother how the bruises were inflicted, Mary replied that there were bruises wherever Michael had tried to pick her up. T.T. 7/5/94 at 57.

This testimony is entirely consistent with Michael's claim, made to hospital personnel as well as the New Heritage caseworker, that he attempted to pull Mary to a standing position and dragged her across the carpeted floor prior to calling for emergency help. In light of this paucity of record evidence, we cannot agree that evidence of an abusive relationship existed and that such should have been admissible to prove motivation or intent at trial.

Order affirmed; jurisdiction relinquished.